Daniel Thomas Kantos, etc. Dering Pierson Group, LLC v. Daniel Thomas Kantos Good morning. May it please the Court, my name is Shana Marchand and I am here on behalf of the appellant Dering Pierson Group, LLC. In the present case, the debtor Daniel Kantos filed a false and defamatory mechanics lien and in so doing also committed unauthorized practice of law and then when the state district court judge found that he had committed unauthorized practice of law and defamation, filed bankruptcy to avoid the consequences of that court's judgment. And we are here requesting that the panel reverse the bankruptcy court's finding that his conduct in filing this defamatory mechanics lien was not willful and malicious. With regard to the willful prong, N. Ray Nyberg, 459 B.R. 15 I'm sorry, counsel, but can we take one step back before you get to that on the standard of a review? Is it your contention that the trial court applied the wrong law? In part, yes. It's our contention that the trial court did not properly apply the willful and malicious standard as articulated in N. Ray Nyberg to the record that was before it. You're saying it's a question of application of law to fact or is it the law that's wrong? A question of the application of the law to the facts. Right. So then it's a question of whether the evidence supports the factual finding that there was no willful and malicious conduct, correct? I suppose, I guess part of the... Let me be more direct. You suggest in your brief that the appropriate way of looking at this is a mixed question of law and fact, but you cite no case to support that assertion. Do you have any law to support that? Nothing specific, no, sir. All right. Thank you. The willful prong specifically is not limited to circumstances where the debtor desires to bring about the specific consequences of his conduct, but includes situations where if the debtor knows that certain consequences are substantially certain to result from his conduct, then he's treated as if he desired to produce those consequences. Can I jump in now and ask you what were the consequences that were certain or substantially certain to result from the filing of the mechanics lien statement? According to the Debtor's Own website, filing of mechanics liens arguably increases the speed at which you are paid, and at trial he admitted that the way that that occurs is by putting pressure on an owner to withhold funds from a general contractor in order to then pressure the general contractor to pay the subcontractor. Did any of that happen in this case? You know, I'm not certain. He also acknowledged, though, that having the mechanics lien filed for the public to see that states that you're not paying your bills can negatively affect a business's reputation. Was there any evidence in the record to suggest that that took place in this case? In this case, we're talking about defamation per se, defamation in the course of business? Well, I understand you're talking about defamation per se, but I'm talking about the consequences of the act of filing the mechanics lien statement. He had to know or had to be certain or substantially certain that consequences would follow from his act, and I'm asking you what were the consequences? And if you're having difficulty identifying those consequences, how was Mr. Cantos to know or be substantially certain that those consequences were going to occur? On the record before the bankruptcy court, he acknowledged that these are things that he expected to happen, and in fact... in this case, that Mr. Cantos, that were either certain or substantially certain to result from the filing of the mechanics lien. What's the evidence in the record of those consequences that your client suffered? I don't believe that that specifically was addressed before the bankruptcy court because it wasn't directly relevant to the issue of his intent. Well, it's directly relevant to 523A6 analysis. It's the first prong. To be willful, the actor has to, the consequences have to be certain or substantially certain. Well, let me try it a different way. We couldn't find any evidence in the record to support that proposition. Are we missing anything? Because that prong in Nyberg does focus on what the debtor knew or expected to happen, we focused on his testimony regarding what he expected to happen when they filed that mechanics lien. Did he say that he expected it to happen with respect to your client, or was his testimony more general that that sometimes does happen? His testimony was that this is generally what tends to happen when you file a mechanic, and that in fact, an owner, for example, withholding funds from the general to pressure them to file a mechanics lien, that is the reason that they would file a mechanics lien and give notice to the owner. So he knew that that was a consequence that could happen. But if he did not know the mechanics lien statement was false, he would not have anticipated those consequences, correct? That was my question. Was there any evidence that Mr. Kantos knew that there was no merit to the claim he was filing? The evidence in the record was that he took information from his client, he made no effort to verify that information, but he hadn't swore that it was true as of yet. But he never knew it was false, did he? He testified that he did not know it was false at the time he filed it, but he made no effort to determine whether it was true. But how did he have an intent to cause harm, which is what 523A6 is about, an intent to cause harm? The record reflects that he intended to encumber the property with a lien in order to pressure Daring Pearson Group to pay Rockstar. Can you direct me to the part of the record where that is the evidence? The evidence I thought was he filed a mechanics lien in order to secure a lien against the property to protect his client's interests. That was what I recalled reading in the transcript. Was there evidence where he said he intended to pressure your client? He did not use that word, no. In fact, is there any evidence other than as soon as he learned, as soon as Mr. Cantos learned that there was no basis for his client's claim, he withdrew the mechanics lien and I believe two weeks after it was filed, is that correct? That is correct. So doesn't that tend to indicate he did not intend to injure your client? It indicates that he did not intend to falsely file a lien, but he also, as I said, he made no effort before filing that lien to determine whether it was true or not before he went ahead and signed it as of his own knowledge. Wasn't there under the applicable law a pre-lien notice that went out and he got no response to that, isn't that true? That is true. So there was no indication then after having done that that there was any problem with the lien, correct? The pre-lien notice didn't address a number of the issues that in fact, the statements that in fact were false in the lien statement, including the dollar amount owed, the type of work performed. I think you can see that we're having a little trouble with the filing of the lien being an act intended to injure. Let's move to the practice of law. How does that fit within the rubric of 523A6? It's not the practice of law per se, it's the conduct in filing the lien, which was the basis both for the defamation claim and the unauthorized practice of law. Which goes back to the failure to investigate the merits of his client's claim. So if that fails, does the unauthorized practice of law claim fail? With regard to the exception that we're seeking from the discharge as to both matters, it's based on the same conduct by Mr. Cantos. Did you want to save the rest of your time for rebuttal? Or are we just into the five minute warning on our original time? I'm sorry. I'm sorry. Go ahead. I'm sorry, counsel. I just wanted to briefly address the malice prong since we haven't talked about it, and specifically that it requires conduct targeted at the creditor. And while Mr. Cantos states his conduct was not targeted at Daring and Pearson Group, he filed a lien stating that they had failed, that Daring and Pearson Group was the one who had failed to pay Rockstar. If that's not targeted towards Daring and Pearson Group, I'm not sure what is. I just wanted to make sure I got that out there. With the lien, go ahead. We'll save your time for rebuttal. Okay. Thank you. Ms. Running? Good morning, Your Honors. Good morning. Terry Running, representing defendant and debtor Daniel Cantos. I know that you've read all the materials and read the briefs, so I just wanted to point out a few things that may not be apparent from the surface. There's always a story behind these things. There's always a person behind these things, and my client is just a 58-year-old guy who a little business filing this mechanic's liens. They've been doing it for 20 years. They didn't do anything in this case that was any different than anything they'd been doing all along. But my guess is after this case, they changed their business practice? They shut the business down. It put them out of business, Your Honor. When he was sued, when he and his company were sued and the unauthorized practice of the law order came down, he immediately shut down the mechanic's lien portion of it. And as you can imagine, with the lawsuit looming and inability to defend that, he also shut down the collection agency portion of the business, which resulted in the bankruptcy filing. The filing of the mechanic's lien was simply a mistake. His client, I think it's undisputed in the record that Mr. Cantos, Cash Flow Management's firm, gave him the wrong information. When the information came into his firm, it actually came into his stepdaughter, who had taken over the role of his wife, who was deceased. Did the pre-lien notice. It went out. It came back with nothing. They filed the mechanic's lien. The minute they got the letter from Drohl, Mr. Cantos immediately contacted his client, investigated, found out that it was incorrect, and immediately released the lien. It was 12 days between that. To the best of my client's recollection, he only had one other claim in that entire 20 years where there was another mistake, and it was also corrected. It was simply a mistake, and it can't possibly ... There was no evidence whatsoever in the record to support a finding at all of willfulness or malicious conduct. The only allegations that plaintiff can point to are that it was arguably negligent or reckless. Assuming that that's accurate, that's simply not enough under ... I call it Geiger because I can't pronounce the Hawaiian name of the Kaua'u. Every time it comes up, I go to the Supreme Court website. They have a pronunciation guide, and it's not pronounced anything like you would expect it to be pronounced, so Geiger works for me too. Thank you, Your Honor. I appreciate that. Under the Geiger case, that's simply not enough. The one thing that may not be apparent in anything in the record in the insistence on trying to force these state law claims into the 523A6 analysis are, if you've taken a look at the complaint or the summary judgment motion, all of the state law claims use the private attorney general statutes. And so, there are attorney's fees attached to those, and the plaintiff is very insistent in trying to make those claims fit into the 523A6 analysis, and it simply does not. Judge Fischer found that there was absolutely no evidence of willful or malicious conduct on behalf of Mr. Kantos. Thank you, ma'am. Thank you. Ms. Marchand, you have about a little over four minutes left. Unless the panel has additional specific questions, I think I've covered all of my initial... Okay. Well, I guess I had one, so that you can have an opportunity, perhaps, to address once again this question about the evidence to support a finding of willfulness or maliciousness. There are a couple of things that stand out to me in the record that you might want to address. I realize it's not required for there to be any personal spite or ill will, but one has to ask the question, if he intended to harm them, why? Is there any evidence of bad blood between these parties or a motive? Why would the defendant do this? What did he have to gain from doing it? There's no specific evidence about that, no. But I would point out that, with regard to the malice prong, Nyberg does specifically state conduct can be found malicious within the meaning of the statute, even in the absence of a specific subjective intent to harm. I recognize that's a correct statement of the law, but one just asks, well, why? If you assume that... If your assertion is that he did it with the intent to harm, what explains that? And if there is no such explanation, it seems to me it kind of undermines that case. The other point is, and I think this was touched on, is that the evidence shows that there was a lack of compliance. So he didn't step out of his ordinary rituals or routines or anything to do this, and to me, that also sort of undermines the assertion that it was done intentionally or maliciously. Did you want to address that evidence? Our position on that is that the fact that he repeatedly did this to others does not necessarily make it any less, for lack of a better word, problematic in the current situation. It just means that he did it repeatedly before somebody... Well, there is no evidence that he was accused of or had filed false liens against others. Is there one possible exception that he corrected, and that was many years in the past? No. The evidence is that, though, as a non-attorney, he repeatedly filed mechanics liens, as of his own knowledge, and that his practice was not to confirm the truth or falsity of those materials before filing them. But once again, isn't that not sufficient to raise to the level of willfulness or malicious the mere fact that he didn't know whether it was true or false? Doesn't he have to have known it was false and proceeded in the face of that knowledge? Our position is he knew the financial consequences of filing mechanics liens, and he proceeded to intentionally file a mechanics lien with the intent of causing those consequences, and that is sufficient. Well, on the consequences thing again, didn't he testify, and isn't it your experience, that this gets worked out in a variety of ways, just like it did in this case, and that sometimes there are no consequences, so there might not necessarily have been consequences for him to anticipate? He equivocated quite a bit, but eventually did acknowledge that part of it, and like I said, his firm's website, they advertised their services by saying, we can file liens and that will help you get paid faster, and he acknowledged that the way that that happens is by pressuring an owner to withhold funds. But he wasn't pressuring because as soon as he learned that his client wasn't entitled to the lien, he withdrew it. Anyway, I think we've beaten that horse. Okay, thank you both for your arguments. Thank you.